STATES v. DAHLSTROM 713 F.2d 1423 (9th Cir. 1983)                                    Page 1

U.S. 9th Circuit Court of Appeals Reports

UNITED STATES v. DAHLSTROM, 713 F.2d 1423 (9th Cir. 1983)

UNITED STATES OF AMERICA, PLAINTIFF-APPELLEE, v. KARL L. DAHLSTROM, R. BRUCE RIPLEY, HIRAM E. CONLEY, DAVID J. MORRIS, AND GAZE DURST, DEFENDANTS-APPELLANTS.

Nos. 82-1137, 82-1141, 82-1138, 82-1142 and 82-1143.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 10, 1983.

Decided August 24, 1983.

Page 1424

David L. Botsford, Austin, Tex., for Dahlstrom.

Joe Alfred Izen, Jr., Houston, Tex., for Ripley.

Merwin D. Grant, Phoenix, Ariz., for Conley.

Kenneth Kanev, Seattle, Wash., for Morris.

Irwin H. Schwartz, Seattle, Wash., for Durst.

Robert E. Lindsay, Alan Hechtkopf, Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Appeal from the United States District Court for the Western District of Washington.

Before GOODWIN, ALARCON, and FERGUSON, Circuit Judges.

ALARCON, Circuit Judge:

[1] Appellants Dahlstrom, Ripley, Conley, Morris and Durst were convicted by a jury of conspiracy to defraud the United States, 18 U.S.C. § 371, and of aiding and abetting the preparation and presentation of fraudulent income tax returns. 26 U.S.C. § 7206(2). Each appellant contends the evidence was insufficient to sustain a conviction as to the crimes charged against him. We agree.

[2] I. STANDARD OF REVIEW

[3] In determining whether a jury verdict rests on sufficient evidence, a
Page 1425
reviewing court must view the evidence in the light most favorable to the prosecution and determine "whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); United States v. Universal Trade and Industries, 695 F.2d 1151, 1153 (9th Cir. 1983).

[4] II. PROCEDURAL BACKGROUND

[5] Appellants were charged in a seven-count criminal indictment brought by the United States. Count I charged all five appellants with conspiracy to defraud the government in violation of 18 U.S.C. § 371. Counts II through VII charged one or more of the appellants with violations of section 7206(2) of the Internal Revenue Code.

EXHIBIT
A

[6] Dahlstrom and Ripley were indicted under all of the counts. Dahlstrom was convicted under every count save count IV, and Ripley was convicted under counts I, III and V. Conley was charged and convicted under counts I, II, VI, and VII. Morris was charged and convicted under counts I and V, while Durst was both charged and convicted under counts I and VII.

[7] The district court sentenced each appellant to imprisonment on count I: Dahlstrom for five years, Ripley for four years, Conley for three years, Morris for 18 months and Durst for one year. The court also sentenced each appellant to five years probation on each of the remaining counts on which he was convicted.

[8] III. FACTS

[9] In 1976, Dahlstrom began to promote and sell a tax shelter program he had devised. At various times thereafter, Ripley, Conley, Morris and Durst joined in the promotion and sale of the program.

[10] Sales of the program took the form of sales of membership in an organization that Dahlstrom had formed called, the American Law Association (ALA). Purchasers of the program bought membership in the ALA. As members, they were entitled to receive instruction and materials relating to the tax shelter program at ALA two-day seminars. Members attending these ALA seminars were charged fees ranging from $6,000 to $12,000.

[11] At these seminars, Dahlstrom and Ripley instructed members on how to create foreign trust organizations (FTO's) in order to reduce their tax liabilities. The members were also provided with forms for setting up such trust organizations and documenting trust transactions. In addition, members received instruction on a "taxpayer defense program" which consisted of lawful actions a member could utilize in the event of an IRS audit. While the program did not include advice or assistance in preparing a member's income tax return, some of the appellants occasionally assisted a member in establishing his FTO by traveling to the designated country and executing the requisite trust documents on behalf of that member.

[12] Members who implemented the ALA tax shelter program caused three trust organizations to be created in a foreign country by a citizen of that country. Typically, trust number one would be named trustee of trusts two and three, although the person implementing the FTO's retained complete control over all three trusts.

[13] This tax shelter program contemplated that trust number two would be treated as a non-resident alien (purely for tax purposes) and would be subject to tax on payments from the user of the program. In order to reduce trust two's tax liability, purchasers of the program had trust two make payments to trust three. Payments made to trust three would not represent taxable income since trust three would be a foreign entity receiving income from a foreign source.

[14] The final stage of this tax shelter program involved the return to the purchaser of some or all the money he paid to trust number two. In order to achieve this goal,
Page 1426
a purchaser would have trust two borrow money from trust three and execute a demand note payable to trust three. Trust three would then transfer the demand note to the purchaser as a gift and the purchaser would demand and receive payment from trust two. This method was premised on 26 U.S.C. § 102 (IRC), which excludes gifts from gross income for income tax purposes, and IRC section 2501 which provides a gift tax exemption for gifts of intangible property by a non-resident alien to a citizen of the United States.

[15] The thrust of the government's case depended in large part on evidence of the trusts and subsequent tax return of Dr. John Ricketts. In November of 1977, Dr. Ricketts expressed interest in the ALA program and attended introductory meetings. Dr. Ricketts' accountant ultimately advised against use of the ALA tax shelter program.

[16] After discussions with his accountant, however, Dr. Ricketts asked O'Leary, a former IRS investigator, to review a tape he had made of a December meeting of the ALA. Shortly after submitting the tape to O'Leary, Dr. Ricketts was contacted by Randy Draughon, an agent for the IRS Criminal Fraud Investigation Division. Agent Draughon returned Dr. Ricketts' tape and asked him to assist in an investigation of the ALA.

[17] In November of 1978, Dr. Ricketts attended an ALA two-day seminar. He was accompanied by IRS agent Walter Perry, who posed as Vince Paoli, a financial advisor to Dr. Ricketts. In order to assist the IRS investigation, Dr. Ricketts authorized appellant Conley to implement the ALA tax shelter program in Belize.

[18] After Dr. Ricketts' trusts were set up, Dahlstrom and Conley advised Agent Perry and Ricketts on creating a deduction by repurchasing his tax package from one of his trusts. Conley also recommended that Ricketts obtain accounting services from Durst. Though it was not his general practice to prepare tax returns for ALA members, Durst agreed to do so for Dr. Ricketts.

[19] Durst advised Agent Perry that Dr. Ricketts could deduct $50,000 for 1978, for the repurchase of his tax package from his trust number two if the check had been written before the end of December, 1978. On March 30, 1979, Agent Perry received the tax return that Durst had prepared for Dr. Ricketts. On the return, Durst had taken a deduction for Dr. Ricketts' repurchase of the tax shelter package. Agent Perry forwarded the return to IRS Special Agent Don Jensen. Dr. Ricketts was not concerned with the validity of this return since he had been advised by Agent Jensen that the Durst return would not represent his true return with the IRS.

[20] This investigation resulted in the return of a seven-count criminal indictment based upon Dr. Ricketts' transaction and a number of similar transactions involving other appellants.

[21] IV. SUFFICIENCY OF THE EVIDENCE

[22] A. *Counts II-VI*

[23] Counts II through VI charged the defendants with various violations of section 7206(2) of the Internal Revenue Code. This section imposes criminal sanctions against anyone who "willfully aids or assists in, procures, counsels, or advises the preparation or presentation under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter . . . ." 26 U.S.C. § 7206(2). Appellants contend that the government's proof was insufficient to establish that they willingly and knowingly aided in the presentation and preparation of false income tax returns.

[24] In order to convict a person under section 7206(2), the government must prove the following elements of the offense beyond a reasonable doubt:

[25] 1. That defendants aided, assisted, procured, counseled, advised or caused the preparation and presentation of a return;

[26] 2. That the return was fraudulent or false as to a material matter; and

Page 1427

[27] 3. That the act of the defendant was willful. *United States v. Perez*, 565 F.2d 1227, 1233-34 (2nd Cir. 1977); *United States v. Crum*, 529 F.2d 1380 (9th Cir. 1976).

[28] The Supreme Court has defined the term "willfully" under section 7206 to mean a "voluntary intentional violation of a known legal duty." *United States v. Pomponio*, 429 U.S. 10, 12, 97 S.Ct. 22, 23, 50 L.Ed.2d 12 (1976); *United States v. Drape*, 668 F.2d 22, 26 (1st Cir. 1982). We have determined that the term "willful" under the statute "requires proof of a specific intent to do something which the law forbids; more than a showing of careless disregard for the truth is required." *United States v. Brooksby*, 668 F.2d 1102, 1104 (9th Cir. 1982).

[29] The dispositive issue in this case is whether the evidence shows that appellants acted with the specific intent to violate section 7206(2). We have concluded, when viewed in the light most favorable to the government, that the evidence was insufficient to support a finding that appellants possessed a specific intent to violate section 7206(2).

[30] In order to meet its burden of proof as to the appellants' willfulness, the government relies upon three major contentions. First, the government asserts that the FTO's advocated by the ALA had no economic substance and were therefore blatant shams. Second, the government argues that the "taxpayer defense program" could reasonably be found to be inconsistent with a belief in the legality of the tax shelter program. Finally, the government points to some statements made by appellant Durst to show that the appellants had guilty knowledge.

[31] In support of its first contention, the government argues that the law is clear that economic realities of a transaction rather than form are controlling for tax purposes. Consequently, the government asserts that the appellants were well aware of the inherent illegality of the tax deductions which flowed from use of the ALA tax shelter program. The government, however, has not pointed to any cases which invalidated the FTO's presented in this particular case. Moreover, the government's own expert witness, Karl K. Krogue, testified that the trusts created through implementation of the ALA tax shelter program were valid legal entities.

[32] The government's reliance on *Zmuda v. Commissioner*, 79 T.C. No. 714 (1982), is misplaced. *Zmuda* did not address the issues of good faith, intent, or belief in the legality of the deductions. The sole issue before the tax court was whether Zmuda's FTO's had a business purpose, and if the claimed deductions were valid. We further note that *Zmuda* was a civil proceeding. It was not decided until some ten months after these appellants had been convicted. Due process requires that a person be given fair notice as to what constitutes illegal conduct so that he may conform his conduct to the requirements of the law. *United States v. Batchelder*, 442 U.S. 114, 123, 99 S.Ct. 2198, 2203, 60 L.Ed.2d 755 (1979). Reliance on *Zmuda* as establishing an ex post facto determination that the ALA tax shelters were illegal would not afford the appellants that fair notice.

[33] The government's assertion that the law was clear as to the application of substance over form in criminal prosecutions under section 7206(2) is further contradicted by the evidence at the time of trial. The use of foreign trusts to save taxes was still a highly debatable issue. Darrell D. Hallett, Regional Counsel for the IRS in Seattle, called as a witness for the prosecution, testified that his office had been approached by a number of practitioners who were confused as to the laws dealing with foreign trusts. This confusion prompted the Deputy Director of the IRS to issue a position paper regarding the use of foreign trusts. We

note that this position paper was not issued until August 8, 1979. The indictment in this matter was premised upon actions which occurred before the issuance of the paper.

[34] Even if we were to assume that appellants were negligent in continuing to
Page 1428
promote the ALA tax shelter program in light of the IRS's adverse position paper, the law is clear that "degrees of negligence only give rise in the tax system to civil penalties." *United States v. Bishop*, 412 U.S. 346, 360, 93 S.Ct. 2008, 2017, 36 L.Ed.2d 941 (1972). The criminal law concerns itself with willful violations of tax law, *United States v. Brooksby*, 668 F.2d at 1102; and "its purpose is not to penalize frank differences of opinion." *United States v. Bishop*, 412 U.S. at 361, 93 S.Ct. at 2017.

[35] We are convinced that the legality of the tax shelter program advocated by the appellants in this case was completely unsettled by any clearly relevant precedent on the dates alleged in the indictment. "It is settled that when the law . . . . is highly debatable, a defendant – actually or imputedly – lacks the requisite intent to violate it." *United States v. Critzer*, 498 F.2d 1160, 1162 (4th Cir. 1974). A criminal proceeding pursuant to section 7206 "is an inappropriate vehicle for pioneering interpretations of tax law." *United States v. Garber*, 607 F.2d 92, 100 (5th Cir. 1979).

[36] As noted above, the government asks us to find that the ALA's use of a taxpayer defense program is sufficient proof of a specific intent to violate section 7206(2). Even the government concedes, however, that the actions recommended in the taxpayer defense program were not unlawful (Gr. Br. p. 27). We are unpersuaded that the appellant's advocacy of various lawful actions translates into proof that the appellants were aware of the illegality of their tax shelter program.

[37] Even if the defendants knew that a taxpayer who actually performed the actions they advocated would be acting illegally, the first amendment would require a further inquiry before a criminal penalty could be enforced. With the exception of Durst, no defendant actually assisted in the preparation of any individual tax return. Rather, they merely instructed an audience on how to set up a particular tax shelter. Nothing should be clearer at this stage in the development of first amendment jurisprudence than "the principle that the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy . . . of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Bradenberg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam).

[38] Nothing in the record indicates that the advocacy practiced by these defendants contemplated imminent lawless action. Not even national security can justify criminalizing speech unless it fits within this narrow category; certainly concern with protecting the public fisc, however laudable, can justify no more.

[39] Finally, the government cites several statements made by Durst as sufficient to show the appellants' requisite intent. Although these statements may have been admissible against Durst as admissions upon proof of a corpus delicti of some crime, they were clearly inadmissible as proof of the crimes charged against the other appellants.

[40] In order for the statement of a coconspirator to be admissible against his fellow conspirators under Rule 801(d)(2)(E), Fed.R.Evid., the government must establish substantial independent proof of the existence of the conspiracy. *United*

States v. Perez, 656 F.2d 654, 658 (9th Cir. 1981); United States v. Eubanks, 591 F.2d 513, 519 (9th Cir. 1979). As we explain below, there is no independent proof of a conspiracy. Therefore, these statements could not be used against Durst's codefendants for any purpose.

[41] We conclude that proof of the requisite intent to violate section 7206(2) is not shown in this record.

[42] B. Count VII

[43] Count VII related to the tax return prepared by Durst for Dr. John Ricketts.
Page 1429
This return was never filed with the IRS. It was never intended to represent Dr. Ricketts' true return with the IRS. (RT 2395-96). The government contends that an offense under section 7206(2) may be committed without the filing of a document. We disagree.

[44] In United States v. Habig, 390 U.S. 222, 88 S.Ct. 926, 19 L.Ed.2d 1055 (1968), the Supreme Court specifically stated that the crime of fraudulent preparation of a tax return is "committed at the time the return is filed." Id. at 223, 88 S.Ct. at 927. Other courts have arrived at similar conclusions.

[45] In Butzman v. United States, 205 F.2d 343 (6th Cir. 1953), the defendant argued that the statute of limitations started to run on the day the fraudulent return was prepared, not the later date upon which it was filed. In rejecting the argument, the court stated "[n]o crime was committed by Butzman until the application was filed. No crime would have been committed if the application had not been filed." Id. at 351. See also United States v. McGee, 572 F.2d 1097 (5th Cir. 1978) (offense of filing a fraudulent return is complete at the time of filing).

[46] We find that the filing of a return is in fact an element of a section 7206(2) violation. Since the return prepared by Durst was never filed, each appellant's conviction under count VII must be set aside.

[47] C. Conspiracy

[48] Appellants were convicted of conspiracy to defraud the United States by impeding, impairing and obstructing the IRS in the ascertainment, computation, assessment and collection of income taxes. 18 U.S.C. § 371. The appellants contend that they lacked the necessary intent to commit the substantive offense. We agree.

[49] We have determined that the government must prove the following elements in order to sustain a conviction for conspiracy:

[50] 1. Agreement to accomplish an illegal objective;

[51] 2. Coupled with one or more overt acts in furtherance of the illegal purpose; and

[52] 3. The requisite intent to commit the substantive offense.

[53] United States v. Melchor-Lopez, 627 F.2d 886 (9th Cir. 1980).

[54] "It is hornbook law that when knowledge of a fact is required to convict for a substantive offense, knowledge is also required to convict for conspiracy to commit the substantive offense. Ingram v. United States, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1969); United States v. Eaglin, 571 F.2d 1069, 1074 (9th Cir. 1977); United States v. Bekowies, 432 F.2d 8, 14 (9th Cir. 1970). "Conspiracy to commit a particular substantive offense cannot exist without at least the degree of criminal intent necessary for the substantive offense itself."

\TES v. DAHLSTROM, 713 F.2d 1423 (9th Cir. 1983)                                      Page 7 of

*Ingram v. United States*, 360 U.S. at 678, 79 S.Ct. at 15...

[55] What we have said concerning the insufficiency of the evidence as to counts II through VI is also dispositive of the conspiracy count. The government's failure to present evidence as to the appellants specific intent to violate the underlying substantive count requires us to set aside the convictions premised upon 18 U.S.C. § 371.

[56] V. CONCLUSION

[57] The government has failed to establish that the appellants advocated a tax shelter program with the specific intent to violate section 7206(2).

[58] These appellants were prosecuted in spite of the fact that no statute, regulation or court decision gave fair warning that advocacy of the creation of lawful foreign trust corporations as a tax shelter would result in a criminal prosecution if the challenged transaction might later be held to lack economic substance for purposes of a civil tax proceeding.

[59] Prosecution for advocacy of a tax shelter program in the absence of any evidence of a specific intent to violate the law is offensive to the first and fifth amendments of the United States Constitution.

[60] The judgments are REVERSED.
Page 1430

[61] GOODWIN, Circuit Judge, dissenting:

[62] The majority's opinion finds that what defendants assisted, counselled, and advised their clients to do was not clearly illegal at the time they gave the advice and assistance. The majority therefore finds a failure of "proof of a specific intent to do something which the law forbids," *U.S. v. Brooksby*, 668 F.2d 1102, 1104 (9th Cir. 1982). The opinion notes that *Zmuda v. Commissioner*, 79 T.C. No. 714 (1982) was not decided until ten months after these convictions.

[63] The government specifically did not rely on *Zmuda*. It had no need to so rely. It relied on settled principles of tax law regarding sham "gifts" and transactions. Defendants advised their clients to use sham transactions to evade taxes. Such schemes have been illegal since *Gregory v. Helvering*, 293 U.S. 465, 469-70, 55 S.Ct. 266, 267-68, 79 L.Ed. 596 (1935) and *Knetsch v. United States*, 364 U.S. 361, 81 S.Ct. 132, 5 L.Ed.2d 128 (1960). See also *Barnett v. C.I.R.*, 364 F.2d 742 (2nd Cir. 1966); *Lynch v. C.I.R.*, 273 F.2d 867 (2nd Cir. 1959). There were no "gifts" here within the clear intent of the statute because the taxpayers controlled the transactions of their trusts. See *Hilda M. Royce*, 18 T.C. 761 (1952); see also *Jackson*, 32 BTA 470 (1935); *Stine*, 32 BTA 482 (1935).

[64] Defendants' knowledge that they were advising and assisting illegal tax evasion is obvious from the record. Defendant Morris provided client Howlett false employer identification numbers to be used in connection with the sham trust bank accounts. Defendant Durst recommended that client Ricketts set up additional sham trusts to make future transactions more difficult for the I.R.S. to trace. Defendants Ripley and Durst recommended that clients use blue "copy-not" pens to sign checks so that I.R.S. agents could not read them on bank microfilm records. Defendant Morris instructed client Dr. Howard Bean to use specified fictitious names as the authorized signatures on bank accounts opened for the trusts and Morris accompanied Bean when Bean opened accounts using the fictitious names supplied by Morris. Bean also followed Morris's advice and used a false name on a non-resident alien tax return he filed for one of his sham

trusts. Defendant Durst counselled clients to alter their Social Security numbers on trust bank accounts to prevent the I.R.S. from tracing them.

[65] Defendants' clear knowledge of the illegality of their scheme was evident in the affidavit they required all participants to sign stating that they would not aid any governmental unit or agency in any civil, criminal, or administrative action against the defendants, and that the member would not divulge to any governmental agency any information concerning his relationship with the defendants. Defendant Durst explained to "client" Paoli (I.R.S. Special Agent Perry) why all the strategies for concealment were necessary. "If they (the I.R.S.) get ahold of your books or records, they could probably shoot holes in this thing. . . . Yeah if they do you're in trouble. . . . Then you're talking about tax avoidance, tax fraud, and the whole thing." There could hardly be any clearer evidence that the defendants in this case knew that what they were advising and assisting clients to do was patently illegal.

[66] Defendants did more than advise taxpayers. They committed acts in furtherance of the conspiracy. Defendants Conley and Morris traveled to Belize and the Turks and Caicos Islands to set up sham trust organizations for the taxpayers. Defendants Conley, Ripley and Morris also actively assisted taxpayers in opening bank accounts for the sham trusts. And defendant Durst prepared a fraudulent tax return.

[67] Attendance at ALA meetings and distribution of ALA membership fees established membership in the conspiracy for all defendants except Durst. Defendant Durst attended ALA meetings but did not receive distributions of membership fees. But he did counsel his clients to participate in the scheme and agreed with his co-conspirators that he would prepare tax returns claiming deductions based on the ALA program. Durst thus participated in the conspiracy and by counselling his clients to file fraudulent
Page 1431
tax returns he committed a substantive offense in furtherance of the conspiracy.

[68] Durst did more. He actually prepared a fraudulent tax return that he believed his client, Dr. Ricketts, would file and he thus violated 26 U.S.C. § 7206(2). Ricketts did "file" the return, but both Ricketts and the I.R.S. knew that it would not be his true return, because Ricketts was cooperating with the I.R.S. investigation of the scheme.

[69] 26 U.S.C. § 7206(2) states:

"Any person who — . . . (2) . . . Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document . . . shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $5,000, or imprisoned not more than 3 years, or both, together with the costs of prosecution."

[70] I cannot agree with the legal conclusion in the majority's opinion that Durst could not have violated 26 U.S.C. § 7206(2) because the return was never "presented" as a true return to the I.R.S.

[71] Title 26 U.S.C. § 7206(2) makes aiding or advising "the

UNITED STATES v. DAHLSTROM, 713 F.2d 1423 (9th Cir. 1983)                                                   Page 9 of 9

preparation or presentation" of a fraudulent income tax return a crime. There are no cases in this circuit holding that presentation is a necessary element to the separate crime of fraudulent preparation. To create such a requirement would render the words "preparation or" mere surplusage. For returns that are actually presented, the term "presentation" would be enough to permit punishment of the advisor. The statute was clearly intended to reach tax return preparers whether or not the returns they prepare are ultimately presented. A statute should be construed so that no word, sentence, or clause shall be superfluous. *Ex Parte Public Bank*, 278 U.S. 101, 104, 49 S.Ct. 43, 44, 73 L.Ed. 202 (1928); *Consolidated Flower Ship. v. Civil Aeronautics Bd.*, 205 F.2d 449, 450 (9th Cir. 1953).

[72] The cases cited in the majority's opinion are not in point because all were cases in which the fraudulent return was both prepared *and* presented and the question was from what date the statute of limitations should run. *United States v. Habig*, 390 U.S. 222, 88 S.Ct. 926, 19 L.Ed.2d 1055 (1968) held that the government could press charges within six years from the actual filing of the returns, not from the statutory due date. Presentation is a separate act from preparation and the government could prosecute up to six years from that act. There was no holding in *Habig* that the government could not prosecute for fraudulent preparation alone

[73] Similarly in *Butzman v. United States*, 205 F.2d 343 (6th Cir. 1953), cert. denied, 346 U.S. 828, 74 S.Ct. 50, 98 L.Ed. 353 (1953), the Sixth Circuit ruled that the statute of limitations ran from the date of filing, not from the date of preparation. The dicta in *Butzman* that no crime was committed until the application was filed and that no crime would have been committed if the application had not been filed have never been adopted by the Ninth Circuit. The dicta would render the words "preparation or" in § 7206(2) nugatory, and we should not adopt them.

[74] The crime of fraudulent preparation should be deemed complete when the preparer delivers the returns to a client with the belief that the client will file them.

[75] Durst advised Ricketts to back date a check so that he could claim a deduction. And the tax return he prepared for Ricketts included a deduction for "repurchase" of ALA tax shelter documents that Durst knew was a sham. He knew the return he prepared contained false deductions and he therefore violated § 7206(2).

[76] There was no violation of first amendment protected speech or association here. The first amendment does not protect communications that are part of conspiracies to commit unlawful acts. *U.S. v. Buttorff*,
Page 1432
572 F.2d 619 (8th Cir. 1978), cert. denied 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978).

[77] Viewing the evidence in the light most favorable to the jury's verdict and drawing all reasonable inferences, there was substantial evidence from which the jury reasonably could have found the defendants guilty beyond a reasonable doubt. *U.S. v. Friedman*, 593 F.2d 109, 115 (9th Cir. 1979); *U.S. v. Jacobo-Gil*, 474 F.2d 1213, 1214 (9th Cir. 1973).

Copyright © 2003 Loislaw.com, Inc. All Rights Reserved