FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

| | |
|---|---|
| JERRY A. DIXON, Hoyt W. & Barbara D. Young, Robert L. & Carolyn S. Du Fresne, Terry D. & Gloria K. Owens, Richard & Fedella Hongsermeier, et al.; PATRICIA A. DIXON, *Petitioners*, RICHARD HONGSERMEIER; FIDELLA HONGSERMEIER; TERRY D. OWENS, *Petitioners-Appellants*, v. COMMISSIONER OF INTERNAL REVENUE, *Respondent*. | No. 00-70858 IRS Nos. 29643-86 30979-85 30010-85 22783-85 40159-84 15907-84 4201-84 9382-83 OPINION |

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
October 10, 2002—San Francisco, California

Filed January 17, 2003

Before: Dorothy W. Nelson, Michael Daly Hawkins and
Kim McLane Wardlaw, Circuit Judges.

Opinion by Judge Hawkins

841

844        DIXON v. COMMISSIONER OF INTERNAL REVENUE

## COUNSEL

Henry Binder, Porter & Hedges, Houston, Texas, for appellants Dixon, DuFresne, and Owens.

Michael Louis Minns, Houston, Texas, for appellants Hongsermeier.

Joe Alfred Izen, Jr., Bellaire, Texas, for appellant Young.

John Dudeck, Tax Division, U.S. Department of Justice, Washington, D.C., for the appellee.

DIXON v. COMMISSIONER OF INTERNAL REVENUE          845

## OPINION

HAWKINS, Circuit Judge:

"Truth needs no disguise."[1]

We must decide whether the Tax Court's finding of a pattern of government misconduct amounts to a fraud on the court and, if so, whether such a fraud requires a showing of prejudice to justify relief. We conclude that the misconduct, including its persistence and concealment, did indeed amount to a fraud on the court. Consistent with Supreme Court authority and the law of this Circuit, we hold that no showing of prejudice is required and, for the reasons that follow, we reverse the Tax Court determination that these taxpayers are not entitled to relief.

### Factual Background & Procedural History

During the 1970s and 1980s, a group of individual taxpayers participated in an investment program and tax shelter designed and administered by Honolulu businessman Henry Kersting ("Kersting"). The investments, which came to bear Kersting's name, consisted of a somewhat complicated program in which participants purchased stock with loans from Kersting-controlled entities financed by two layers of promissory notes.[2] Kersting marketed the product as a legitimate

---

[1] Justice Hugo Black in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 247 (1944), *overruled on other grounds by Standard Oil v. United States*, 429 U.S. 17, 18 (1976).

[2] The Kersting investment consisted of the following: (i) corporate stock or stock subscription rights or investment certificates purchased by a loan from a Kersting company (a "Primary Note"); (ii) prepayment of interest on the Primary Note financed by a secondary or "leverage" note from another Kersting entity at a lower interest rate than the Primary Note; (iii) principal on the Primary Note paid by surrender of the stock or other underlying asset; and (iv) interest on the Primary Note paid by a distribution from the corporation whose stock was purchased with the Primary Note. *Dixon v. Comm'r*, 62 T.C.M. (CCH) 1440, 1454-62 (1991) (original Tax Court opinion).

investment which would enable participants to claim interest deductions on their individual tax returns. When Kersting participants claimed those deductions,[3] the IRS issued notices of deficiency, disallowing all interest deductions taken, and reasoning that the underlying transactions were shams, the interest was not "paid or properly accrued," and the notes did not constitute a bona fide indebtedness.

In a Tax Court action brought by Kersting on their behalf, program participants sought a redetermination of the deficiencies. Recognizing that the sheer number of affected taxpayers (approximately 1,800) made it impractical to try each case individually, the parties agreed to employ a "test case" approach to determine liability. To facilitate this process, the bulk of affected taxpayers signed stipulations ("piggyback agreements") agreeing to be bound by the decision of a test case trial involving representative taxpayers. The agreed-upon process provided that two representatives would be chosen by the taxpayers' attorneys and five by IRS attorneys. Approximately 1,300 taxpayers, some 500 already having settled, signed on to the piggyback agreements.

The test cases proceeded to a consolidated one-month trial before the Tax Court sitting in Honolulu. The Tax Court ultimately concluded that the taxpayers were liable for all assessed deficiencies and would be required to pay additional negligence and tax-motivated transaction penalties. Crucial to this determination was the testimony of John R. Thompson ("Thompson"), the only taxpayer who testified that he believed the instruments creating the claimed interest would not be enforced.

As it turns out, that which the Tax Court and other participants believed to be a legitimate, representative proceeding, binding on the test case petitioners and all those waiting in the wings, was anything but. Some time prior to the test case trial,

---

[3] Deductions were claimed pursuant to 26 U.S.C. § 163.

DIXON v. COMMISSIONER OF INTERNAL REVENUE        847

Kenneth W. McWade ("McWade"), the IRS attorney trying the case, and William A. Sims ("Sims"), the IRS attorney with supervisory authority over it, had entered into secret settlement agreements with Thompson and another test case petitioner, John R. Cravens ("Cravens"). Cravens was one of the taxpayer-selected test case representatives, chosen by taxpayer counsel because his payment of capital gains taxes upon exiting the Kersting investment program made him a particularly good representative.

A condition of their settlements required Thompson and Cravens to remain test case petitioners. McWade also convinced Cravens, who mistakenly believed his liability was finalized by the settlement, to proceed *pro se*. With respect to Thompson,[4] McWade agreed to have Thompson's tax deficiencies reduced in proportion to his attorney's fees, which exceeded $60,000. At no point did McWade or Sims reveal to the Tax Court or to any other taxpayer representative that two of the test case petitioners' cases had been settled, much less reveal the conditions imposed on them.

The deception continued with a cover-up, which was carefully designed to prevent the Tax Court and other taxpayers from learning of the secret settlement agreements. At Kersting's deposition, which McWade attended, Kersting's lawyer objected to the presence of Thompson's attorney because of rumors that Thompson was attempting to settle. Knowing that Thompson had, in fact, already settled, McWade remained silent. McWade then misled the Tax Court by failing to disclose the settlement when he moved to set aside the Thomp-

---

[4] Thompson had an ongoing dispute with Kersting over the validity of the investment certificates. Specifically, Kersting had threatened to initiate collection proceedings against Thompson. Therefore, Thompson had an interest in seeing that the certificates of investment were declared invalid and unenforceable. DeCastro, Thompson's attorney, used the test case proceeding to elicit testimony from Thompson regarding the sham nature of the notes in order to bolster Thompson's position in any subsequent litigation with Kersting.

848         DIXON v. COMMISSIONER OF INTERNAL REVENUE

son piggyback agreement, a pre-trial motion necessary to ensure Thompson's status as a test case petitioner. Deceptive silence matured into overt misconduct when, during the course of the test case trial, it became apparent that Thompson was going to testify about his settlement. McWade quickly shifted his questions to unrelated matters.[5]

McWade and Sims also secured an agreement with taxpayer Dennis Alexander[6] ("Alexander") whereby the IRS would reduce Alexander's tax deficiencies in exchange for testimony and trial preparation assistance. In accordance with this agreement, the IRS paid for Alexander's expenses in

---

[5] In the Tax Court proceedings on remand, Judge Beghe pointed to the following exchange as evidence of this deception:

> Mr. Thompson: The procedure went through a tax firm in Los Angeles known as Loeb & Loeb, and I wound up with the DeCastro Law Corporation by way of their direction, and made several discoveries that were startling to me. And of course, I settled. To be quite honest, I had to get out of this. I was not going to spend my life—
>
> Mr. McWade: Well, let me—
>
> Mr. Thompson: —doing all this.
>
> Mr. McWade: Let me stop you here for a moment.
>
> Mr. Thompson: Okay. I'm sorry. I beg your pardon.
>
> Mr. McWade: Mr. Thompson, can you tell me: have we been successful in getting the lien removed from your house?

Thompson's use of the word "settled" did not disclose the secret settlement between Thompson and the IRS because, in the original proceeding, Judge Goffe mistakenly interpreted the remark as referring to resolution of the Thompsons' tax liability for another year which was not at issue. *Dixon v. Comm'r*, 77 T.C.M. (CCH) 1630, n.55. McWade did nothing to disabuse the court of its interpretation.

[6] Alexander was then embroiled in a legal battle with Kersting involving more than $4 million. Alexander's animus towards Kersting was made clear in a letter to the IRS ("When the Nazi knows that 1400 of his clients are going to be clobbered and that he will have the Criminal Investigative Division of the IRS coming down on him, I think he will be inclined to pay me my money.").

| DIXON v. COMMISSIONER OF INTERNAL REVENUE | 849 |
|---|---|

Hawaii for the length of the trial. McWade then filed a memorandum regarding the basis for the settlement of Alexander's tax liabilities which the Tax Court later found to be false. During the test case trial, McWade also sat silently through testimony by Alexander that he knew to be false.[7]

The Tax Court ultimately entered judgment against the remaining taxpayers—those who had signed on to the piggyback agreements—on the same adverse terms as in the test case resolution. This is when the McWade-Sims house of cards began to collapse. Thompson and Cravens, who had sat silent while the Tax Court entered judgment against them, pressured McWade and Sims to live up to the terms of their secret settlement agreements. It was now clear that the IRS would have to move to set aside the Thompson and Cravens judgments; McWade and Sims were forced to reveal the secret settlements necessitating the Tax Court's entry of "revised" judgments in favor of Thompson and Cravens.

After being asked to approve the set aside motions, senior IRS officials determined that McWade and Sims had engaged in active misconduct and informed the Tax Court of the secret settlements,[8] asking for an evidentiary hearing to determine the extent of the damage. The Tax Court refused to hold an evidentiary hearing and proceeded to enforce the terms of the Thompson and Cravens settlements. The taxpayers appealed the refusal to this Court, which remanded with instructions to hold an evidentiary hearing. *Dufresne v. Comm'r*, 26 F.3d 105 (9th Cir. 1994).

---

[7] When one of the attorneys for the taxpayers asked Alexander if McWade had discussed a reduction of Alexander's tax deficiency in exchange for his testimony, Alexander responded, "Specifically, no." McWade failed to correct this patently false statement.

[8] As the Tax Court proceeding on remand revealed, this disclosure was anything but complete, excluding, for example, the arrangement to "pay" (through a reduction in disallowed deductions) $60,000 to Thompson for his attorney fees.

850     DIXON v. COMMISSIONER OF INTERNAL REVENUE

On remand, the Tax Court conducted the mandated evidentiary hearing. Incredibly, McWade's pattern of deception continued with his persistent denial that the Thompson settlement was a vehicle for paying Thompson's attorneys' fees and his testimony that the Thompson settlement was attributable to a separate transaction. After making extensive findings concerning the government's misconduct, the Tax Court surprisingly concluded that what had occurred was harmless error. While the bulk of the decision from the original test case proceeding was reinstated, the Tax Court did relieve the taxpayers of that portion of the original judgment which imposed increased interest penalties for negligence and "tax motivated transactions" and imposed costs and attorneys' fees on the IRS. From the Tax Court's refusal to vacate the adverse judgments against them, the taxpayers filed this timely appeal. We have jurisdiction pursuant to 26 U.S.C. § 2482.

## Standard of Review

We review the Tax Court's refusal to grant a motion vacating a judgment on the basis of fraud on the court for abuse of discretion, *Abatti v. Comm'r*, 859 F.2d 115, 117 (9th Cir. 1988); *England v. Doyle*, 281 F.2d 304, 309 (9th Cir. 1960), mindful that only when this Court has a "definite and firm conviction that the Tax Court committed a clear error of judgment in the conclusion it reached" is reversal appropriate. *Abatti*, 859 F.2d at 117.

## Discussion

[1] Courts possess the inherent power to vacate or amend a judgment obtained by fraud on the court, *Toscano v. CIR*, 441 F.2d 930, 933 (9th Cir. 1971), but that power is narrowly construed, applying only to fraud that defiles the court or is perpetrated by officers of the court. When we conclude that the integrity of the judicial process has been harmed, however, and the fraud rises to the level of "an unconscionable plan or scheme which is designed to improperly influence the

DIXON v. COMMISSIONER OF INTERNAL REVENUE    851

court in its decisions," we not only can act, we should. *England*, 281 F.2d at 309; *Levander v. Prober*, 180 F.3d 1114, 1119 (9th Cir. 1999); *Intermagnetics Am., Inc. v. China Int'l Trust and Inv. Corp.*, 926 F.2d 912, 916-17 (9th Cir. 1991).

[2] Here, the factual findings of the Tax Court support the conclusion that a fraud, plainly designed to corrupt the legitimacy of the truth-seeking process, was perpetrated on the trial court by McWade and Sims. The Tax Court, however, applied the wrong law when it imposed a requirement that taxpayers show prejudice as a result of the misconduct. *Dixon v. Comm'r*, 77 T.C.M. (CCH) 1630 (1999).

[3] Prejudice is not an element of fraud on the court. *Hazel-Atlas*, 322 U.S. at 238; *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128, 1132-33 (9th Cir. 1995).[9] Fraud on the court occurs when the misconduct harms the integrity of the judicial process, regardless of whether the opposing party is prejudiced. *Alexander v. Robertson*, 882 F.2d 421, 424 (9th Cir. 1989). Furthermore, the perpetrator of the fraud should not be allowed to dispute the effectiveness of the fraud after the fact. *Hazel Atlas*, 322 U.S. at 247; *Pumphrey*, 62 F.3d at 1133. Because the Tax Court applied the wrong legal standard, it abused its discretion. *See Paulson v. City of San Diego*, 294 F.3d 1124, 1128 (9th Cir. 2002) (en banc).

---

[9] The Seventh Circuit reached a contrary decision in *Drobny v. Commissioner*, 113 F.3d 670, 678-79 (7th Cir. 1997). *Drobny* distinguishes *Hazel-Atlas* by claiming that *Hazel-Atlas* involved the general equitable powers of the federal courts as opposed to those of the Tax Court. *Id.* at n.15. The Ninth Circuit, however, holds to the view that the application of the fraud on the court doctrine in the context of Tax Court cases is the same as applied in Article III courts. *Toscano*, 441 F.2d at 934; *see also* 24 ALR Fed. 697 (1975) ("The construction and application of the phrase [fraud on the court] in other federal courts, as well as its use in Rule 60(b), although not binding in Tax Court cases, have been considered helpful when it has been necessary to apply the phrase in regard to possible vacation of final Tax Court decisions.").

852     DIXON v. COMMISSIONER OF INTERNAL REVENUE

[4] As the Supreme Court observed more than fifty years ago, "[t]ruth needs no disguise." *Hazel-Atlas*, 322 U.S. at 247. There can be no question here but that the actions of McWade and Sims amounted to a fraud on both the taxpayers and the Tax Court. The Tax Court believed it was hearing a legitimate adversarial dispute when, in fact, the proceeding was a charade fraught with concealed motives, hidden payments, and false testimony. What did occur was clearly designed to defile the court itself, and there is no question that it was carried out by an officer of the court. *Toscano*, 441 F.2d at 933. Such fraud corrupts the adversarial nature of the proceeding, the integrity of witnesses, and the ability of the trial court to judge impartially. *See England*, 281 F.2d 304. This harm is noteworthy not only because it defiled the sanctity of the court and the confidence of all future litigants, but also because it violated the rights of the test case petitioners and the more than 1,300 taxpayers who agreed to be bound by the outcome of the Tax Court proceeding. *See Levander*, 180 F.3d at 1118 ("[T]ampering with the administration of justice in this manner involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public."). As such, the taxpayers have clearly and convincingly demonstrated fraud on the court and are entitled to relief.

### Remedy

We have the inherent power to vacate the judgment of the Tax Court, fashion an appropriate remedy, *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991); *Hazel-Atlas*, 322 U.S. at 250; *Fink v. Gomez*, 239 F.3d 989, 992 (9th Cir. 2001), and sanction a party or its lawyers for willful abuse of the judicial process, particularly when the party or its lawyers have intentionally practiced a fraud upon the court. *Levander*, 180 F.3d at 1119; *see also Gomez v. Vernon*, 255 F.3d 1118, 1133-34 (9th Cir. 2001). This power, however, is to be "exercised with restraint and discretion." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 765 (1980).

DIXON v. COMMISSIONER OF INTERNAL REVENUE    853

Here, it plainly would be unjust to remand for a new, third trial. The IRS had an opportunity to present its case fairly and properly. Instead its lawyers intentionally defrauded the Tax Court. The Tax Court had two opportunities to equitably resolve this situation and failed. Enormous amounts of time and judicial resources have been wasted. In addition, the IRS has done little to punish the misconduct[10] and even less to dissuade future abuse. The taxpayers should not be forced to endure another trial and the IRS should be sanctioned for this extreme misconduct.

Conversely, we will not enter judgment eradicating all tax liability of these taxpayers. Such an extreme sanction, while within the court's power, is not warranted under these facts. *See Chambers*, 501 U.S. at 45. Instead, we remand to the trial court with directions to enter judgment in favor of Appellants and all other taxpayers properly before this Court on terms equivalent to those provided in the settlement agreement with Thompson and the IRS.[11]

### Conclusion

The judgment of the Tax Court is reversed with directions

---

[10] McWade and Sims were both suspended for two weeks without pay and transferred out of the Honolulu division. Sims accepted this censure and was transferred to the San Francisco Regional Counsel Office, where he was assigned nonsupervisory duties. McWade retired from the IRS, choosing not to accept the terms of the proposed disciplinary action but keeping the $1,000 bonus earlier paid him for his performance in the original Tax Court proceedings. We note that counsel for the Hongsermeier test case petitioners recently filed a grievance against McWade and Sims with the attorneys' respective Bars.

[11] We leave to the Tax Court's discretion the fashioning of such judgments which, to the extent possible and practicable, should put these taxpayers in the same position as provided for in the Thompson settlement

854      DIXON v. COMMISSIONER OF INTERNAL REVENUE

to set aside the decision in *Dixon v. Comm'r*, 62 T.C.M. (CCH) 1440,[12] and to enter judgment in favor of Appellants consistent with this opinion.

REVERSED AND REMANDED WITH DIRECTIONS.

---

[12]This is the judgment entered following the original Tax Court proceeding, which bound the remaining "piggyback" taxpayers. This judgment was reinstated, with modification, following the Tax Court proceeding on remand. *Dixon v. Comm'r*, 77 T.C.M. (CCH) 1630.